UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Brandy Johnson, | |
| *Plaintiff,* | No. 22 CV 6931 |
| v. | Judge Lindsay C. Jenkins |
| John Meade, et al., | |
| *Defendants.* | |

MEMORANDUM OPINION AND ORDER

Brandy Johnson, a former mental health technician at the Ann Kiley Center, brings this suit against John Meade, an Illinois Department of Human Services internal security investigator, and Jonn-Paul Oliveto, an Illinois State Police officer under 42 U.S.C. § 1983 for false arrest, wrongful detention, malicious prosecution, and due process violations under the Fourth and Fifth Amendments, and conspiracy. [Dkt. 1.][1] The allegations in this case center on an investigation into injuries sustained by "S.K.," a non-verbal resident of the Center who has severe intellectual and developmental disabilities. The parties refer to the residents of the Center using only their initials— "S.K.", "G.H.", "M.A.", and "D.C."—so the Court does the same.

For the reasons stated below, Meade and Oliveto's respective motions for summary judgment [Dkts. 44, 51] are granted.

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

## I.      Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). A party that fails to comply with Local Rule 56.1 does so at their own peril. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014). District courts have broad discretion to require strict compliance with Local Rule 56.1. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023).

### A.      Local Rule 56.1 Objections

The Court first addresses Local Rule 56.1 disputes that bear on the facts of the case. Defendants argue that Johnson's Local Rule 56.1 Response and Statements of Additional Facts [Dkt. 70] violate Local Rule 56.1 because Johnson improperly sets forth new facts, makes impermissible legal arguments, and fails to cite or explain how specific material controverts Defendants' factual statements. [Dkts. 91 at 12–14; 88 at 8 n.3.]

To dispute an asserted fact, a party must in its Local Rule 56.1 Response "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). Each response must be "fairly responsive" to the asserted fact responded to and any new facts should be included in an additional statement of facts, not a Local Rule 56.1 Response or brief. L.R. 56.1(b)(3)(B).

2

Several of Johnson's responses contain new facts that aren't responsive to the fact statement they're meant to respond to. [*See, e.g.*, Dkt. 70 at 17–25, ¶¶ 17, 19–21, 28, 32, 45–46, 54.] However, most of these facts are properly included in Johnson's Statements of Additional Facts, which the Court must consider. It will not, however, consider new facts not contained in a Statements of Additional Facts. Where contested factual assertions are not supported by a citation to the record or rely on unsupported conclusions, inadmissible evidence, or legal argument, the Court will disregard those facts.[2]

### B.    Jeanie Perkins Affidavit

Meade objects to Johnson's use of a one-page, unsworn affidavit from mental health technician Jeanie Perkins [Dkt. 70-1 ("Perkins Affidavit")] to support and dispute facts in their Local Rule 56.1 statements. Johnson relies on the affidavit to support her position that G.H., a witness to S.K.'s injury, recanted her allegations about Johnson to Perkins, and that Meade conducted a second, undisclosed interview of G.H. on January 10, 2021. [Dkt. 74 at 9–10.] Meade argues that the affidavit is inadmissible because it doesn't comply with the requirements of a sworn or unsworn affidavit under 28 U.S.C. § 1746. [Dkt. 91 at 12.]

---

[2]    Johnson's Response violates at least one other aspect of Local Rule 56.1. Her submission contains only her responses to Defendants' Statements of Facts without also reproducing the text of the fact to which she is responding. Dkt. 70; L.R. 56.1(e)(1) ("Each paragraph shall set forth the text of the asserted fact (including its citations to the supporting evidentiary material), and then shall set forth the response."). This made it more difficult for the Court to isolate the parties' factual disputes. Johnson also filed a single submission in response to both Defendants' Local Rule 56.1 Statements of Facts. [*See* Dkts. 45, 52, 70.] To avoid confusion, the Court cites both Johnson's Response [Dkt. 70] and the Statement of Facts containing the text of each factual assertion.

3

Under 28 U.S.C. § 1746, an unsworn statement can only have the effect of a sworn statement where the declarant agrees to subject himself to the "penalty of perjury" in a form provided in the statute. The statement must also be signed and dated. "An 'affidavit' that does not subject the declarant to the penalties for perjury is not 'within the range of evidence' that a district court may consider" at summary judgment. *Price v. Federal Bureau of Prisons*, 2022 WL 972294, at *4–5 (N.D. Ill. Mar. 31, 2022) (citing *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2 457, 471 (7th Cir. 1990)); *see also Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014) (a declaration must "compl[y] with the formalities required by 28 U.S.C. § 1746" to be considered on summary judgment). The Perkins Affidavit is not notarized or dated and lacks a statement subjecting Perkins to the penalty of perjury. It therefore falls short of the requirements for a sworn or unsworn affidavit and cannot be considered at summary judgment.

Even if the Court were to examine the content of the affidavit, it wouldn't create a genuine dispute of material fact. There are two statements in the affidavit that Johnson seeks to introduce as facts. First, Perkins stated that on January 10, 2021, G.H. asked her to "call [the internal security investigator]" because "Brandy Johnson did not do what I said she did." [Dkt. 70-1, ¶3.] Contrary to Meade's argument, [Dkt. 91 at 10–11], this statement isn't hearsay because it's offered to impugn G.H.'s credibility as a witness against Johnson, not for its truth. Regardless, it isn't material to summary judgment because the affidavit states that Perkins only told Meade that G.H. wanted to speak to Meade. It doesn't establish that Meade knew

4

on January 10, 2021 that G.H. wanted to change her story or that she was an unreliable witness. The Court also finds, *infra* Part IV.B.2, that Meade and Oliveto are entitled to qualified immunity because there was arguable probable cause to arrest Johnson, and Perkins' call to Meade didn't provide any exculpatory information that would change the Court's analysis.

Second, the Perkins Affidavit states that Meade came to the Center and proceeded to interview G.H. "accompanied by another staff" about that alleged abuse. [Dkt. 70-1.] Affidavits must be based on the declarant's personal knowledge and supported by more than conclusory statements. *Foster v. PNC Bank, Nat'l Assoc.*, 52 F.4th 315, 320 (7th Cir. 2022). This statement is inadmissible for lack of personal knowledge. Perkins didn't explain how she would have known that Meade interviewed G.H. again, she provided no detail on when he did this or who accompanied him, and there's no documentation or other evidence that he did so. *See FTC v. Day Pacer LLC*, 125 F.4th 791, 803 (7th Cir. 2025) (district court "was not bound to accept bare statements in affidavits unsupported by proper documentary evidence." (internal quotation marks omitted)); *Foster*, 52 F.4th at 320.[3] Consequently, the Court disregards the facts in the Perkins Affidavit.

---

[3]     Meade also argues the Perkins Affidavit is inadmissible because it includes information that Johnson didn't disclose during her deposition when Johnson was asked about Perkins' testimony. [Dkt. 91 at 11–12.] Meade didn't include any caselaw to support this argument and the Court need not reach it since the content of the affidavit is inadmissible or immaterial on multiple other grounds.

## II.  Background

The following facts are taken from the parties' Local Rule 56.1 statements and attached exhibits. [Dkts. 45, 52, 70, 87, 89.] The Court presents the facts in the light most favorable to the non-moving party. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). It also notes which material facts are in dispute and whether disputes are supported by admissible evidence.

### A.  State Police Investigation

The Ann Kiley Center ("the Center") is a residential state-run facility for persons with intellectual, developmental, and physical disabilities located in Waukegan, Illinois, managed by the Illinois Department of Human Services ("IDHS"). [Dkts. 45, ¶ 4; 70 at 2, ¶ 4.] As of December 16, 2020, Brandy Johnson was a mental health technician at the Center and was responsible for the care of residents. [*Id.* at ¶¶ 4–5; Dkts. 52, ¶ 1; 70 at 15, ¶ 1.] Defendant John Meade was an Internal Security Investigator with IDHS. [Dkts. 45, ¶ 7; 70 at 2, ¶ 7.] Defendant John-Paul Oliveto worked for the Illinois State Police and, in the relevant period, was a Special Agent for the Department of Internal Investigations ("DII"). [*Id.* at ¶ 6.]

S.K. was a resident of the Center with severe intellectual and developmental disabilities and other medical conditions. S.K. lived in Home 8 during the relevant period. [Dkts. 45, ¶ 8; 70 at 2, ¶ 8; Dkts. 53, ¶ 7; 70 at 16, ¶ 7.] On December 16, 2020, Center employee Daisy Rivas discovered multiple bruises on S.K.'s left breast. [Dkts. 48-1 at 11; 53, ¶ 10; 70 at 16, ¶ 10.] Between 7:50 am and 10:45 am, Registered Nurse Felicia Smith and Doctor Daniel Vu examined S.K. and documented bruising to 45–75% of her left breast. [Dkts. 48-1 at 2–3; 45, ¶ 20; 70 at 3, ¶ 20.] At 7:50 am, Nurse

Smith estimated that the bruising was 0–12 hours old. At 10:45 am, Dr. Vu estimated that it was less than 24 hours old. [Dkts. 45, ¶ 13; 70 at 2, ¶ 13.]

According to staff assignment records, Johnson worked in Home 8 on December 12, 2020 from 3:35–10:45pm, during which she supervised S.K. from 5:45–7:45pm and 9:00–11:00pm. She also worked in Home 8 supervising S.K. on December 13 from 10:45pm–6:45am and on December 14 from 10:45pm–6:45am. [Dkts. 45, ¶¶ 22–24; 70 at 4, ¶¶ 22–24.] It's not clear from the staff logs whether the date for a night shift running into the next day refers to the former or latter day. Still, the parties agree that S.K.'s injury was discovered 48 hours after Johnson's last shift. [Dkt. 53 at 9.] Therefore, the Court assumes that Johnson's last shift ended on December 14 at 6:45am. Staff records for December 15 and 16 are not part of the record and were not requested during the investigation. [Dkts. 87, ¶ 21; 89, ¶ 21.]

Rivas documented on an injury report form that another resident in Home 8, M.A., stated that S.K. fell. [Dkts. 45, ¶¶ 10, 14; 70 at 2, ¶¶ 10, 14.] Although Rivas initially checked a box indicating that the injury was not suspicious, it was later marked as erroneously checked. The form further notes that the injury was suspicious due to its size, shape, and appearance, and because the cause was unknown and there was an "allegation of abuse." [Dkts. 48-1 at 9; 45, ¶ 15; 70 at 2, ¶ 15.]

S.K.'s injury was reported to Investigator Meade, who began a preliminary review of the allegations the day S.K.'s injury was discovered. [Dkts. 52, ¶ 11; 70 at 16, ¶ 11.] Meade conducted two brief interviews before turning the case over to ISP, which are documented in the ISP Investigative File. [Dkt. 56 at 65–67.] First, Meade

interviewed Kirsten Foreman, a Residential Services Supervisor and Home 8 Manager. [Dkts. 52, ¶ 12; 70 at 16, ¶ 12.] Foreman reported that resident D.C. stated that S.K. fell, and resident M.A. (who was S.K.'s roommate at the time) similarly stated she "fell down having a behavior." [*Id.*; Dkt. 48-1 at 13–14.] Foreman also stated that resident G.H. reported witnessing the injury and stated that Johnson "grabbed [S.K.'s] breast and stepped on her foot."[4] [*Id.*]

Meade interviewed G.H. for about five minutes. During the interview, G.H. stated that she saw Johnson grab S.K.'s breast, pinch it, and push S.K. onto a bed, causing her to scream. Meade reported that G.H. demonstrated grabbing and squeezing with both hands and open fingers. G.H. also reportedly stated that M.A. was present when S.K. was injured but was "lying about what happened." According to his report of the interview, this happened, "a couple of nights ago, not last night" when "Brandy Johnson worked overtime in her home." Meade ended the interview and reported the alleged abuse to ISP agents, who were already at the facility for another case. [Dkts. 45, ¶¶ 17–18; 52, ¶¶ 13–14; 70 at 2–3, ¶¶ 17–18; 70 at 16, ¶¶ 13–14.] Meade also notified them that the physical assessment found bruising on S.K., and that the injury allegedly occurred on December 12, 2020. [Dkts. 45, ¶ 26; 70 at 4, ¶ 26.]

ISP agents told Meade they would investigate the abuse allegations. At this point, Meade ended his investigation because his role was to conduct administrative

---

[4] Johnson disputes whether Foreman disclosed to Meade that G.H. reported witnessing the abuse, but Meade stated as much during his deposition. Johnson did not cite any opposing evidence, so Meade's fact is admitted. Loc. R. 56.1(e); [Dkts. 70 at 16, ¶ 12; Dkt. 52-3 ("Meade Dep.") at 39:12–39:23.]

investigations and, once his department receives a complaint from the Center, it's automatically considered a criminal matter. [Dkts. 52, ¶¶ 14–17; 70 at 16–17, ¶¶ 14–17.] Meade conducts initial interviews and collects evidence for ISP. [Dkts. 52, ¶ 15; 70 at 16, ¶ 15; Meade Dep. at 42:17–42:24.] But generally, once a case is turned over to ISP, Meade's role is to act as a point person to provide ISP additional information, if requested, and facilitate their interactions with others to obtain information. [Dkt. 87, ¶ 4.] Meade also testified that if someone were to provide him with information about a case after ISP takes over, he would be required to verbally inform "whoever is conducting the investigation."[5] [Meade Dep. at 56:1–57:3].

ISP officer Oliveto was assigned to investigate the allegation that Johnson abused S.K. [Dkts. 45, ¶ 27; 70 at 4, ¶ 27.] On December 18, 2020, Oliveto received an email containing documents related to the case.[6] [Dkt. 56 at 7.]

On January 22, 2021, Oliveto and fellow officer Brandon Ethridge went to the Center to interview Kirsten Foreman, G.H., M.A., and S.K. [Dkts. 45, ¶ 28; 70 at 4, ¶ 28.] That morning before they arrived, G.H. called Meade and told him she wanted to change her story. [Dkts. 52, ¶ 20; 70 at 18, ¶ 20.] The parties dispute what exactly

---

[5]     Johnson argues that Meade was more involved than these facts suggest. [Dkt. 70 at 17, ¶ 17.] But her claim that Meade interviewed G.H. a second time is based on the inadmissible Perkins Affidavit. Her claim that Meade was more involved because he spoke to ASA Facklam doesn't contradict Meade because there is no dispute that Meade was responding to an information request, which was part of his normal administrative role. Nor is a greater degree of involvement established through Johnson's claim that Meade may have told Oliveto about a call from G.H. because Meade was required to give ISP additional information verbally.

[6]     These included S.K.'s Staff Assignment and Accountability Logs, Individual Support Plan, Injury Report, Observed/Unobserved Injury Supplemental Report, Photographic Log, DHS Division of Developmental Disabilities State-Operated Developmental Centers (SODC) Operations, a Summary Interview of G.H., Foreman's Initial Interview Statement, and email correspondence from Meade. [Dkt. 56 at 7.]

G.H. told Meade. Meade contends that G.H. only indicated that she wanted to change her story, but didn't say how. [Dkt. 52, ¶ 21.] But later, on March 18, 2021, Assistant State Attorney ("ASA") Jeffery Facklam asked Meade whether any witness had recanted. Facklam memorialized the conversation in an Investigatory Report Form. In his documentation of Meade's answer, Facklam stated that G.H. "told [Meade] that she wanted to say that she (presumably, Brandy Johnson) did not do what I said." [Dkt. 89, ¶ 42–43.]

When G.H. called Meade, he told her that he couldn't re-interview her because ISP was handling the investigation, but that ISP agents were on their way to talk to her and that she should tell them the truth. [Dkts. 52, ¶ 20; 70 at 19, ¶ 20.] The parties dispute whether Meade told Oliveto about G.H.'s call before Oliveto interviewed G.H.; Meade and Oliveto's testimony differs on this point. Meade testified that, when Oliveto arrived to conduct interviews at the Center, Meade told Oliveto, "I don't think this is going anywhere because [G.H.] said she wanted to change her story." [Dkt. 89, ¶ 49.] Oliveto testified that he didn't learn this fact until after the grand jury indictment. [Dkt. 87, ¶ 50.] Viewing the facts in Johnson's favor, the Court accepts the former version for Oliveto's motion, and the latter for Meade's motion.

When Oliveto and Ethridge arrived at the Center, they interviewed G.H.[7] [Dkt. 70 at 9, ¶ 37.] Oliveto began by asking G.H. if she knew why he was there. She

---

[7]     The parties dispute each other's descriptions of Oliveto's interviews with G.H. and M.A. Johnson argues that Oliveto led M.A. in answering, while Oliveto argues that he used open-ended questions. [Dkts. 70 at 6–7, ¶¶ 32–35; 73 at 10–11; 88 at 3.] Rather than accept either party's representations, the Court reviewed the interviews in full and recounts them herein based on the audio recordings. *Manery v. Lee*, 124 F.4th 1073, 1077 n.2 (7th Cir. 2025)

responded, "kind of." [Dkt. 45-13 ("G.H. Interview") at 00:40–00:48, 1:30–2:02.] Oliveto told G.H. he was going to let her tell him why she believed he was there. She responded, "Brandy [Johnson]." Oliveto said, "Can you tell me about, uh, Brandy?" [*Id.* at 2:02–2:19.] G.H. went on to say that she saw "Brandy step on [S.K.'s] feet and pinch her boobs" after S.K. got up to use the bathroom. [*Id.* at 2:20–2:30.] Oliveto asked G.H. a series of open-ended questions about what happened, such as "Did you see this happen?" and "Why did this happen, G.H.?" G.H. stated she and M.A. both saw what happened. [*Id.* at 2:34–2:37.] G.H. said the incident happened because S.K. wanted to get up to use the restroom. [*Id.* at 2:38–2:48.] The parties agree that Dr. Vu inspected S.K.'s foot and found no injury. [Dkt. 89, ¶ 39.]

Oliveto and Ethridge also interviewed M.A. on January 22, 2021. Oliveto began by asking M.A. if she knew why he was there. M.A. responded that it was "because … I think, um, my roommate [S.K.]," and that "somebody (inaudible) to her." [Dkt. 45–15 ("M.A. Interview") at 1:15–1:42.] Oliveto asked M.A. to clarify the answer by asking "stepped on her?," and M.A. responded "stepped on her real hard . . . and um . . . Brandy Johnson." [*Id.* at 1:42–2:00.] Oliveto responded, "Oh wow, ok, alright, ok, nice, you have a good memory . . . So Brandy Johnson's the one that stepped on whose foot?" [*Id.* at 2:00–2:18.] M.A. repeated Johnson's name and then said S.K.'s name, but lost focus on the question. Oliveto redirected her attention:

> Oliveto: "So what did, what did Brandy Johnson do to [S.K.]?
>
> M.A.: "She hit her."

---

(The court views the facts in the light most favorable to the nonmovant but can rely on clear and conclusive recordings if they "firmly settle[ ] a factual issue.").

| Oliveto: | "She hit her? How?" |
|----------|---------------------|
| M.A.: | "Probably with her fist." |
| Oliveto: | "With her fist? And you're motioning that she stomped on her foot?" |
| M.A.: | "Yes." |
| Oliveto: | "Okay, where did she hit her with her fist? Oh, on the chest?" |
| M.A.: | "With her boobs." |

[*Id.* at 3:08–3:46.] M.A. said she saw S.K.'s bruises on her body when she was naked. [*Id.* at 3:49–4:24.] Oliveto asked if anyone else was in the room during the incident and M.A. said G.H. was there. During the interview, M.A. made statements that implicated G.H., specifically that G.H. was hitting S.K. with a towel, possibly to get S.K. to stand up from the floor.[8] [*Id.* at 6:34–7:37.]

Oliveto unsuccessfully tried to interview S.K., who is non-verbal. [Dkts. 45, ¶ 36; 70 at 8, ¶ 36.]

After the interviews, two ISP officers conducted photographic lineups with G.H. and M.A. G.H. positively identified Brandy Johnson, but M.A. did not. [Dkts. 45, ¶¶ 38–39; 70 at 9, ¶¶ 38–39.]

## B. Arrest and Criminal Proceedings

Oliveto interviewed Johnson on February 10, 2021. [Dkts. 45, ¶ 43; 70 at 10, ¶ 43.] After the interview, he called Lake County ASA Dino Katris, who approved the

---

[8]      Johnson claims that this evidence shows that G.H. hit S.K., not Johnson. [Dkts. 70 at 8, ¶ 35; 73 at 5.] No reasonable jury could conclude from the photographic evidence that S.K.'s bruising (consisting of multiple deep, round bruises) was caused by being struck with a towel. [Dkt. 56 at 64.]

filing of aggravated battery and abuse charges.[9] Johnson was arrested that day and held in the Lake County Jail for six hours before being released on bail. [Dkts. 45, ¶¶ 43–44; 70 at 10, ¶¶ 43–44; Dkts. 52, ¶¶ 33–34, 40; 70 at 22–23, ¶¶ 33–34, 40.] Meade didn't know Johnson was going to be arrested until Oliveto emailed him hours after the arrest. [Dkts. 52, ¶¶ 34–36, 39; 70 at 22, ¶¶ 34–36, 39.]

Around February 2021, Johnson's defense counsel contacted ASA Facklam, the Chief of the Felony Division at the Lake County State's Attorney's Office ("LCSAO"), to ask whether a witness may have recanted. [Dkts. 45, ¶ 47; 70 at 10, ¶ 47.] Facklam wasn't assigned to Johnson's case, [Dkt. 87, ¶ 43], but emailed the Chief of the Felony Review Division, Stephen Scheller, asking if there was anything to defense counsel's statement that a witness recanted.[10] [Dkts. 45, ¶ 48; 70 at 11, ¶ 48.] On March 18, 2021, Facklam contacted Meade for information about any recantations. Facklam documented a summary of the conversation, stating that "Meade said that sometime after her initial statement . . . [G.H.] called ISI Meade and told him that she was calling to say that she (presumably, Brandy Johnson) did not do what I said. ISI Meade told [G.H.] that someone from the [ISP] was going to interview her and that she should tell the [ISP] the truth . . ." [Dkt. 45-21.] Facklam documented this conversation and included it in the case file because he believed that the information was exculpatory and should be disclosed in discovery. [Dkts. 87, ¶ 46; 89, ¶ 43.]

---

[9]     The specific charges were Aggravated Battery, 720 ILCS 5/12-3.05(c) and Abuse or Criminal Neglect of a Long Term Care Facility Resident, 720 ILCS 5/4.41(b)(1)(D). [Dkts. 52, ¶ 34; 70 at 22, ¶ 34.]

[10]     According to Facklam, the Felony Review Division handles a case pre-indictment, and the Felony Division handles the case afterwards. [Dkt. 45-8 ("Facklam Dep.") at 20:17–21:02.]

Facklam also spoke with Scheller about this conversation before the grand jury was impaneled. [Dkts. 45, ¶ 51; 70 at 13–14, ¶ 51.] At this point, the State's Attorney's Office believed there was probable cause that Johnson had committed a crime, [Dkts. 52, ¶ 46; 70 at 24, ¶ 46; Facklam Dep. at 30:09–30:15], although the parties dispute whether the ASAs involved reviewed Facklam's memo before deciding to seek an indictment. [Dkt. 88 at 11.]

On March 24, 2021, a grand jury was impaneled for Johnson's criminal case. [Dkts. 45, ¶ 54; 70 at 13, ¶ 54.] Oliveto testified, but Meade did not. [Dkts. 52, ¶ 47; 70 at 24, ¶ 47.] The grand jury indicted Johnson for one count of Official Misconduct, 720 ILCS 5/12-3 and one count of Abuse of a Long Term Care Facility Resident, 720 ILCS 5/12-4.4a(a)(1). [Dkt. 52, ¶ 50; 70 at 24, ¶ 50.]

On October 12, 2021, the charges were dismissed because the State, based on a review of the facts, did not believe it could prove the case beyond a reasonable doubt. [Dkts. 52, ¶ 62; 70 at 27, ¶ 62.] This lawsuit followed.

## III.  Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party."

14

*Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Given that Meade and Oliveto filed separate motions for summary judgment, the Court construes the facts in each defendant's favor, respectively, where relevant.

## IV.  Analysis

### A.  Official Capacity Claims

The Eleventh Amendment bars federal actions against state officials acting in their official capacities. *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) (en banc). Johnson initially brought all § 1983 claims against Meade and Oliveto in both their individual and official capacities as state investigators. [Dkt. 1 at 3.] She clarified in response to Meade's summary judgment motion that she is only suing Meade in his individual capacity. [Dkt. 74 at 19.] Nor could Johson sue Meade as an official; whereas *Ex Parte Young* permits injunctive relief against state officials, 209 U.S 123, 159–60 (1908), Johnson only seeks monetary damages. Additionally, prospective relief couldn't remedy her alleged injuries because there's no ongoing violation of federal law, and no action to enjoin. Consequently, the Court dismisses all official capacity claims against Meade and, by the same reasoning, against Oliveto.

### B.  Fourth Amendment Claims

Johnson brings identical Fourth Amendment claims against Meade and Oliveto for false arrest, wrongful detention, and malicious prosecution (Counts I–III, VI–VIII). To prevail on a false arrest/detention claim, she must show that there was no probable cause for her arrest and detention. *Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017); *see also Walker v. White*, 2021 WL 1058096, at *11 (N.D. Ill. Mar. 19,

15

2021) (differentiating false arrest and wrongful detention). Similarly, for malicious prosecution Johnson must show that "a government official charged [her] without probable cause, leading to an unreasonable seizure of [her] person." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024).[11]

## 1. Personal Involvement

Meade argues that Johnson's Fourth Amendment claims fail because he wasn't personally involved in her arrest, detention, or prosecution. Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation. To be personally involved, an official may participate directly in the injury or "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (cleaned up) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)). However shown, "[t]he plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017).

---

[11]    Meade argues that Johnson's malicious prosecution claim is preempted by an adequate remedy under Illinois law. [Dkts. 53 at 24; 91 at 18.] The Seventh Circuit holds that a plaintiff can only bring a malicious prosecution claim as a violation of the Due Process Clause if no adequate state-law remedy exists. *Ray v. City of Chi.*, 629 F.3d 600, 664 (7th Cir. 2011). This doctrine derives from *Parratt v. Taylor*, 451 U.S. 527 (1982), which held that state officials didn't violate a prisoner's procedural due process rights because a state tort suit could provide all the process that was due. *See Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015). The Supreme Court recently clarified that federal malicious prosecution claims are cognizable under the Fourth Amendment. *Thompson v. Clark*, 596 U.S. 36 (2022). Given that *Parratt's* preemption doctrine is based on the availability of due process, it is inapplicable to a Fourth Amendment malicious prosecution claim. *See, e.g., Cruz v. Guevara*, 2024 WL 4753672, at *8–9 (N.D. Ill. Nov. 12, 2024) (applying *Parratt* to malicious prosecution claim brought under the Fourteenth Amendment, but not the Fourth Amendment); *Sneed v. Vill. of Lynwood*, 2022 WL 5116464, at *3 (N.D. Ill. Oct. 4, 2022) (same). Consequently, Johnson can bring a Fourth Amendment malicious prosecution claim.

It is undisputed that Meade didn't suggest Johnson should be arrested, wasn't involved in the decision to arrest, wasn't aware Johnson would be arrested, and wasn't present for the arrest. Nor did he testify before the grand jury. Johnson argues Meade nevertheless played a significant role in causing her arrest and prosecution because he 1) remained ISP's point of contact throughout the investigation, and 2) withheld exculpatory evidence by failing to tell Oliveto that G.H. called saying Johnson "did not do what I said she did."[12] [Dkt. 74 at 9–10.]

Viewing the record in Johnson's favor, a reasonable jury could find that Meade was personally involved in her arrest because he failed to provide critical exculpatory information to ISP. Although Meade's role in the investigation was limited to being an administrative bridge between ISP and the Center once ISP took over, [Dkt. 87, ¶ 4], he testified that, should someone give him information about an investigation ISP assumed, he would need to verbally inform "whoever is conducting the investigation." [Meade Dep. at 56:1–57:03.] Here, that would be Oliveto. Given this evidence and his arguably close relationship to ISP during the investigation, a jury could find that he was expected to disclose exculpatory information, even if he wasn't otherwise responsible for the criminal investigation or prosecution. *See, e.g.*, *Patterson v. Burns*, 670 F. Supp. 2d 837, 849–50 (S.D. Ind. 2009) (failure of police detective with "close relationship" to arresting officers to reveal exculpatory evidence could constitute personal involvement even if he didn't participate in arrest or

---

[12] Johnson's additional claim that Meade was involved in her false arrest because he may have gotten other information from G.H. during a subsequent in-person interview fails because it's based solely on the inadmissible Perkins Affidavit. [Dkt. 74 at 9–10.]

probable cause determination). G.H.'s statement to Meade that Johnson "did not do what I said she did," [Dkt. 89, ¶¶ 42–43], is exculpatory, including because it bears on the credibility of a key witness. *U.S. v. Ruiz*, 536 U.S. 622, 628 (2002) (exculpatory evidence includes "evidence affecting" witness "credibility," where the witness's "reliability" is likely "determinative of guilt or innocence" (quoting *Giglio v. U.S.*, 405 U.S. 150, 154 (1972)). To resolve Meade's motion, then, the Court must assume that Meade didn't tell Oliveto about G.H.'s call.

A jury could also find a causal connection between Meade's failure to disclose and Johnson's arrest. Johnson must show that his omission was a proximate and but-for cause of her injuries. *Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018); *Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012) (but-for cause means "the injury would not have occurred absent the conduct."). Meade's lack of authority to weigh in on Oliveto's decision to arrest or charge Johnson makes her burden a difficult one. On one hand, a fact finder could find that Meade told Oliveto about G.H.'s desire to change her story but that, even armed with this information, Oliveto still would have arrested and pursued charges against Johnson. After all, a jury could believe Oliveto's testimony that he didn't place much weight on Meade's initial interviews, including the fact that M.A. materially changed her story between Meade and Oliveto's interviews.[13] [Dkt. 52-4 ("Oliveto Dep.") at 201:10–202:17.] But the Court cannot conclude that the record is devoid of any evidence establishing Meade's

---

[13]     Johnson also points to Oliveto's deposition testimony to show that Oliveto wouldn't have pursued the case if he knew G.H "recanted." [Dkt. 89, ¶ 52.] Meade argues that certain questions used misleading information and an inaccurate timeline, biasing Oliveto's answers. [*Id.*] The Court agrees that this line of questioning is uninformative and disregards it.

personal involvement. Johnson argues that Meade's conduct was part of a bad faith and incomplete investigation that, as a whole, resulted in the alleged violations. [Dkt. 74 at 11, 16.] She cites multiple allegedly weak aspects of the case (M.A.'s shifting story and inability to identify Johnson, inconsistencies between the estimated injury date and staff log, etc.). [Dkt. 74 at 5–6, 13–15.] It's far from clear whether a jury would consider G.H.'s call the crux of the case. But a reasonable jury might find that Meade didn't disclose it and his failure to do so foreseeably caused Johnson's arrest.

There's also sufficient evidence for a jury to find that Meade was personally involved in maliciously prosecuting Johnson. The only person Meade undisputedly disclosed G.H.'s call to is ASA Facklam, Chief of the Felony Division. [Dkts. 52, ¶ 24; 70 at 23, ¶ 42.] In the due process context, the causal link between an officer's misrepresentation and plaintiff's injury may be broken if the officer discloses the truth to a prosecuting attorney before trial. *Brueggemann*, 682 F.3d at 583. But this assumes that the *relevant* prosecutors receive the information and can use it to make an independent determination. *Id.* ("[I]f the prosecutors had known the truth and proceeded anyway . . . then the immunized prosecutorial decisions would be the cause of the injury." *Id.* (quoting *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir. 1994)). Here, there's a material dispute about whether the attorneys prosecuting Johnson's case were informed about G.H.'s call. Facklam, as part of the Felony Division, wasn't involved in the decision to seek indictment or even assigned to Johnson's case. His documentation of his call with Meade went into a discovery file but not the ISP Investigative file, so there's a question of fact as to what information the handling

19

attorneys reviewed before seeking indictment (the parties presented no evidence on this in either direction). Facklam told ASA Scheller about the call, but it's not clear whether Scheller disclosed it to the handling attorneys before LCSAO sought indictment. A jury might conclude that Scheller, Chief of the Felony Review Division, would have disclosed exculpatory information to the handling attorneys. But it might also conclude that the handling prosecutors didn't review this evidence such that they could make an informed, independent decision breaking the chain of causation. Consequently, though thin, the Court cannot say that no reasonable juror could find that Meade wasn't personally involved in Johnson's malicious prosecution.

Johnson raises the same Fourth Amendment claims against Oliveto (Counts VI–VIII). Oliveto didn't contest personal involvement and these same factual disputes (whether Meade disclosed G.H.'s call to Oliveto, what the handling attorneys reviewed before seeking indictment) would allow a jury to find him personally involved in the alleged Fourth Amendment violations.

### 2. Qualified Immunity

Meade and Oliveto argue they're further entitled to summary judgment for the same reasons. First, they argue that Oliveto had probable cause to arrest Johnson, which is an absolute defense to claims of false arrest, wrongful detention, and malicious prosecution. [Dkts. 46 at 10–12; 53 at 19–21.] Second, the grand jury indictment creates a presumption of probable cause, which Johnson cannot rebut. [Dkts. 46 at 12–13; 53 at 21–22.] Third, they're entitled to qualified immunity because Oliveto had arguable probable cause to arrest. [Dkts. 46 at 20–21; 53 at 27–29.] The

Court concludes that Meade and Oliveto are both individually entitled to qualified immunity and needn't address their other arguments.

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Siler v. City of Kenosha*, 957 F.3d 751, 758 (7th Cir. 2020) (internal quotation marks omitted). Qualified immunity applies "unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (quoting *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017)). The Court may consider these issues in either order. *Id.*

"Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 723–24 (7th Cir. 2013).

In the context of Fourth Amendment false arrest, wrongful detention, and malicious prosecution claims, qualified immunity exists if the officer had arguable probable cause to arrest. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) ("If an officer has 'arguable probable cause' . . . we cannot say that the officer violated the plaintiff's clearly

21

Case: 1:22-cv-06931 Document #: 99 Filed: 02/20/25 Page 22 of 38 PageID #:1433

established constitutional rights."). "Probable cause to arrest exists when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023) (cleaned up). Arguable probable cause is distinct from probable cause and exists when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Mwangangi*, 48 F.4th at 825. Probable cause is a "purely objective" inquiry, *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022), whereas arguable probable cause considers whether an officer's subjective beliefs were objectively reasonable. If a reasonable officer "could have mistakenly believed that probable cause existed," he is shielded from liability. *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 726 (7th Cir. 1998)). This standard provides "'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Id.* (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)). Courts look to the totality of the circumstances. *Id.* at 656.

### i.    Claims Against Oliveto

Johnson attempts to defeat Oliveto's qualified immunity defense by arguing that he violated constitutional rights clearly established by analogous caselaw. To meet her burden, Johnson cites cases for the propositions that it was clearly unconstitutional at the time of her arrest for a law enforcement officer to (1) "intentionally withhold exculpatory evidence," (2) "ignore evidence that there was another perpetrator of the crime," and (3) "rely on witnesses whose allegations were

22

unreliable and later recanted." [Dkt. 73 at 17.] However, these propositions are incomplete—and they seem to define the constitutional right at too high a level of generality. What Johnson seems to mean is that these actions deprive an officer of probable cause, making any subsequent arrest unconstitutional. This comes dangerously close to the generalized assertion that arrest without probable cause violates the Fourth Amendment. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 792 (7th Cir. 2022) ("We've repeatedly told litigants [that the assertion that an arrest made without probable cause violated the Fourth Amendment] is at an impermissibly high level of generality for qualified immunity purposes"); *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015) ("It is not enough to simply assert that it was clearly established law that officers need probable cause to arrest a person."). Her propositions are slightly more specific but don't adequately define the contours of unconstitutional actions she describes to "alert every reasonable police officer that the particular conduct taken by [Oliveto]" would violate the Fourth Amendment. *Allin v. City of Springfield*, 845 F.3d 858, 863 (7th Cir. 2017).

To prove that a right is clearly established with a closely analogous precedent, a plaintiff must show that the law was clear "in relation to the specific facts confronting the public official when he acted." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Johnson makes no argument in this regard. She cites a handful of cases for the general propositions she lays out but doesn't at all describe the particular facts of each case or how they relate to this one. [Dkt. 73 at 17.] *McBride v. Grice* states that an officer can't ignore facts clarifying a situation to establish

probable cause, but *McBride* is dissimilar because that court found probable cause. 576 F.3d 703 (7th Cir. 2009). *Madero v. McGuinness* made a similar assertion but also found that the defendant had probable cause. 97 F.4th 516 (7th Cir. 2024). *Youngblood v. West Virginia* is irrelevant here because it describes *Brady* claims, which are distinct from Fourth Amendment claims, and which Johnson can't bring because her case did not result in a trial. 547 U.S. 867 (2006); *see infra* Part IV.C. Apart from specific cases cited, Johnson generally directs the Court to "other authority cited *supra* at 5–7." [Dkt. 73 at 17.] It's Johnson's burden to point to specific cases and explain how they establish closely analogous precedent. The Court will not sift through her brief and make the arguments for her.

Lacking analogous caselaw, Johnson's only option is to persuade the Court that Oliveto's conduct was "so egregious" that it was "an obvious violation of a constitutional right." *Cibulka v. City of Madison*, 992 F.3d 633, 641 (7th Cir. 2021). She's failed to do so because an officer in Oliveto's position could have mistakenly believed he had probable cause to arrest Johnson.

"The existence of probable cause depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Doe*, 75 F.4th at 719 (cleaned up). Johnson was arrested and charged for: Aggravated Battery, 720 ILCS 5/12-3.05(c) and Abuse or Criminal Neglect of a Long Term Care Facility Resident, 720 ILCS 5/4.4a(b)(1)(D). As to the aggravated battery charge, a "person commits aggravated battery when, in committing a battery, [] the person battered is on or about [] public property []." 720 ILCS 5/12-3.05. As relevant here, battery occurs when

24

a person "knowingly without legal justification by any means, (1) causes bodily harm to an individual . . . ." 720 ILCS 5/12-3(a)(1). Government-owned property is public property for the purposes of the statute. *People v. Castillo*, 215 N.E.3d 780 (Ill. 2022).

As to the abuse charge, "[a] caregiver commits criminal abuse or neglect of [a] person with a disability when he or she knowingly" "physically abuses, harasses, intimidates, or interferes with the personal liberty of the person." 720 ILCS 5/12-4.4a(b)(1)(D). This can be broken down into three main elements: (1) a caregiver (1) physically abuses (3) a person with a disability. For the first element, "caregiver" is "a person who has a duty to provide for [a] . . . person with a disability's health and personal care, at the . . . person with a disability's place of residence . . ." ILCS 5/12-4.4a(e). "'Person with a disability' means a person who suffers from a permanent physical or mental impairment [], which renders the person incapable of adequately providing for [] her own health and personal care." 720 ILCS 5/12-4.4A.

The parties don't dispute that it was reasonable for Oliveto to assume that Johnson, a mental health technician responsible for resident care at the Center, was a "caregiver." It's also undisputed that S.K. was a "person with a disability", *see* dkt. 70 at 16, ¶ 7, and that her injury occurred at the Center, which is "public property" because it's a state-run facility. Johnson, who bears the burden of rebutting a qualified immunity defense once raised, *Taylor v. City of Milford,* 10 F.4th 800, 806 (7th Cir. 2021), only disputes whether it was reasonable to believe Johnson physically harmed S.K.

Oliveto argues that he had arguable probable cause to believe Johnson physically abused S.K. based on the following facts:

- Two witnesses Oliveto interviewed (G.H. and M.A.) said Johnson injured S.K. by pinching or hitting her breasts;

- S.K.'s injury appeared consistent with G.H. and M.A.'s description of the physical abuse because she had several deep, round bruises covering as much as 75% her left breast;

- G.H. stated that the injury occurred "a couple of nights" before December 16, 2020; and

- Johnson supervised S.K. on nights when the injury could reasonably have happened, including December 12 and December 13. [Dkt. 46 at 20.]

Johnson responds that Oliveto lacked arguable probable cause because his investigative decisions were either "plainly incompetent" or knowing violations of the law. [Dkt. 73 at 17–18.] She argues that he was oblivious to exculpatory evidence before him and took an "ostrich-like" approach to important information he simply didn't bother to collect. [*Id.* at 18.]

"Once a law enforcement officer discovers sufficient facts to establish probable cause, he has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence or possible defenses." *Schimandle*, 114 F.4th at 659. Probable cause is "well short of certainty." *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006). While an officer can't ignore clear exculpatory evidence, *Schimandle*, 114 F.4th at 659, he doesn't need to "investigate extenuating

26

circumstances" or seek out information to undermine established probable cause. *Ditlefsen*, 807 F.3d at 250–51. Thus, Johson's arguments that Oliveto lacked arguable probable cause because he didn't pursue specific avenues of investigation that, in hindsight, would have uncovered exculpatory information, are unpersuasive. With that guidance in mind, the Court turns to the totality of the information before Oliveto.

A reasonable officer in Oliveto's shoes could have mistakenly believed that probable cause existed. Probable cause can be established by the statement of a single reasonably credible witness. *Lee v. Harris*, — F.4th —, 2025 WL 300815, at *3 (7th Cir. 2025) ("[O]ur court has held repeatedly that a single eyewitness identification is enough to provide a defense against Fourth Amendment claims."); *Moorer v. City of Chi.*, 92 F.4th 715, 721 (7th Cir. 2024) ("[I]dentification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause."). Here, an officer could have believed that G.H. was reasonably credible: she alleged that she saw Johnson injure S.K. in a timeframe in which Johnson was documented as having supervised S.K. The abuse that G.H. described was consistent with photos of S.K.'s injury. G.H. said that Johnson pinched S.K.'s breasts. S.K.'s left-breast injury depicts several deep, round bruises that could have been consistent with being jabbed or grabbed. Although G.H. said Johnson grabbed both of her breasts and stepped on her foot but S.K. only had bruising on one breast, an officer in Oliveto's position could conclude that the thrust of G.H.'s statement was true, even if she was mistaken about the details of the assault. *Lee*, 2025 WL 300815,

at *4 (inconsistencies do not automatically negate probable cause, which is based on "reasonableness, not perfection." (internal quotation marks omitted)). This is more than enough to establish arguable probable cause.

Johnson argues that G.H. couldn't reasonably be considered credible for three reasons. First, Johnson claims G.H. only implicated her after Kirsten Foreman asked G.H. about S.K.'s bruising, implying that Foreman influenced her responses. [Dkt. 73 at 4.] However, the assertion that Foreman told G.H. about the nature of the bruising before G.H. described what happened isn't supported by Johnson's factual statement or the record.[14] There's no other evidence indicating that G.H.'s initial statement was primed to target Johnson.

Next, Johnson attacks G.H.'s credibility based on her call to Meade on January 22, 2021. [Dkt. 73 at 11–12.] Even assuming that Meade told Oliveto (as he testified) that G.H. "wanted to change her story" before Oliveto interviewed her, this statement doesn't explain *how* she wanted to change her story or whether it would even constitute a recantation of her original statement. In any case, "recantation of a statement on its own does not negate probable cause," much less arguable probable cause. *Garcia v. Posewitz*, 79 F.4th 874, 880–81 (7th Cir. 2023). Meade's statement to Oliveto, therefore, didn't seriously diminish G.H.'s credibility.

---

[14]    The fact statement reads: "Foreman interviewed the ladies in Home 8 who were verbal, including DC, MA, and GH. (See Meade Exhibit 7, p.65). As of December 16, 2021, of the three verbal residents in Home 8 who could have witnessed any alleged abuse, GH was the only resident who said that Plaintiff injured SK and said that MA 'was lying' about what happened; both DC and MA said that the injuries were self-inflicted during a 'fall' and/or 'a behavior.' (See Meade Exhibit 7, p. 65)." [Dkt. 89, ¶ 10.]

The only other evidence Johnson cites to impugn G.H. is her Behavior Intervention Plan, which Oliveto wasn't given and didn't request. Johnson argues that the plan, which describes G.H.'s general behavior and tendencies, shows G.H. isn't credible. She casts Oliveto's failure to request and review it as willful ignorance of relevant information.[15] [Dkt. 73 at 17–18.] As above, Oliveto already had sufficient information to believe G.H. was reasonably credible and wasn't obligated to seek more undermining that determination. *Schimandle*, 114 F.4th at 659. Consequently, Oliveto could rely on G.H. for arguable probable cause, even if he was mistaken about the truth of her accusations.

Oliveto also argues that M.A.'s corroborating statement supports arguable probable cause. The evidence before Oliveto cut both ways on M.A.'s credibility but doesn't extinguish the arguable probable cause established by G.H.'s statements. On one hand, Oliveto was aware that M.A. originally stated that S.K. fell and then recanted, and that she couldn't identify Johnson in a photo lineup. [Dkt. 87, ¶ 36.] On the other hand, Oliveto reasonably believed that S.K.'s injury wasn't caused by a fall because of the bruising pattern, [Dkt. 45, ¶ 20], and M.A.'s statement to Oliveto largely matched G.H.'s: M.A. told Oliveto that Johnson stepped on S.K.'s foot and hit her breasts.[16] Johnson suggests that M.A.'s diminished mental capacity should cut

---

[15]    Oliveto disputes the admissibility of G.H.'s Behavior Intervention Plan [Dkt. 88 at 5–6] but, regardless of its admissibility, it's immaterial because Oliveto didn't review it and didn't need to in order to establish arguable probable cause.

[16]    Johnson asserts that there's no evidence that M.A. and G.H. were separated from one another between their initial statements until their interviews with Oliveto. [Dkt. 87, ¶ 56.] Although true, the implication that M.A. and G.H. coordinated their statements is speculative and unsupported by any other evidence.

against her credibility. [Dkt. 73 at 17.] But the degree to which mental infirmity bears on witness credibility depends on the specific facts of a witness's medical condition. Oliveto didn't know M.A.'s medical history but he asked Center staff whether she would be able to sit for an interview and understand his questions.[17] [Dkt. 87, ¶ 32.] An officer could reasonably have relied on a staff member's assessment of whether a resident whom they're familiar with could participate in an interview. Overall, while there are questions of fact about M.A.'s credibility better suited for a jury, none of the undisputed evidence received from M.A. definitively exculpated Johnson or diminished G.H.'s independent credibility.

The last piece of evidence Oliveto considered was the injury timeline. This also cuts both ways such that a reasonable officer could have mistakenly believed it supported probable cause. According to G.H., Johnson injured S.K. "a couple of nights" before she gave her first statement on December 16, 2020, and not "last night" (on December 15). [Dkts. 45, ¶ 17; 70 at 2, ¶ 17.] Consistent with her statement, staff records show that Johnson supervised S.K. on December 12, 13, and as late as the morning of December 14. [Dkts. 45, ¶¶ 22–24; 70 at 4, ¶¶ 22–24.] Johnson points out that medical personnel estimated that S.K.'s injury occurred 24 hours before she was examined on the morning of December 16, which would place it at or after the morning of December 15. Specifically, Nurse Smith estimated that it occurred in the

---

[17]     The parties dispute whether Oliveto inquired about G.H. or M.A.'s mental capacity before interviewing them, however, the deposition testimony cited shows that Oliveto at least inquired about M.A. When asked if he inquired about her IQ or level of ability, he responded "no," but explained that he asked someone whether she would be able to sit for an interview and understand his questions. [Oliveto Dep. at 80:16–82:07.]

last 12 hours and Dr. Vu estimated in the last 24 hours. Faced with competing statements, Oliveto considered the medical timeline to be an estimate rather than definitive and credited G.H.'s claim that the injury happened a couple nights before December 16. [Dkt. 87, ¶ 20.] This wasn't unreasonable given that Nurse Smith and Dr. Vu each gave different injury timelines. Even if Oliveto were wrong about the certainty of their estimates, another officer could have made the same mistake, especially when they had what appeared to be a reasonably credible witness.

To be sure, Oliveto's investigation wasn't bullet-proof, and the State's Attorney's Office ultimately determined it couldn't prove the case beyond a reasonable doubt. But probable cause doesn't require certainty. *See Sheahan*, 455 F.3d at 775 ("Like a grand jury, police may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence.") (cleaned up). Based on the information before Oliveto, a reasonable officer could conclude that G.H. was a reasonably credible witness. This is enough for arguable probable cause. Other information, such as M.A.'s statements and the injury timeline, cut both ways but didn't definitively exculpate Johnson. Even if Oliveto's probable cause assessment was mistaken, qualified immunity protects him from liability.

Additionally, the fact that Oliveto called ASA Katris, and that Katris approved the charges against Johnson before Oliveto arrested her, [Dkts. 45, ¶ 43; 70 at 10, ¶ 43], "goes a long way toward solidifying his qualified immunity defense." *Ditlefsen*, 807 F.3d at 251 (quoting *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 881 (7th Cir. 2012)). It's well-established that consulting a prosecutor before arresting and

charging someone supports qualified immunity because "[o]therwise the incentive for officers to consult prosecutors—a valuable screen against false arrest—would be greatly diminished." *Fleming*, 674 F.3d at 881 (internal quotation marks omitted); *see also Schimandle*, 114 F.4th at 657; *Myers*, 53 F.4th at 1070 n.2; *Zhang v. Schuster*, 2022 WL 615015, at *19 (N.D. Ill. Mar. 2, 2022) (collecting cases). Johnson's response—that Katris' approval of filing charges shouldn't support immunity because Oliveto provided "incorrect and incomplete information" that led them to approve charges—is unavailing. [Dkt. 73 at 18–19.]

As stated, Oliveto didn't need to collect information beyond that which he had to support arguable probable cause. *Schimandle*, 114 F.4th at 659. Johnson also claims Oliveto withheld exculpatory evidence, including Meade's comment that G.H. wanted to "change her story." Oliveto didn't document this comment, but Johnson makes no persuasive argument that it was material to the probable cause determination. Johnson characterizes it as a "recantation," [Dkt. 73 at 4, 6, 10–12, 14]], which implies that G.H. withdrew her accusation against Johnson. Black's Law Dictionary (4th Pocket Ed. 2011) (defining "recant" as "[t]o withdraw or renounce (prior statements or testimony) formally or publicly."). Regardless of what G.H. told Meade, the evidence—when viewed in Johnosn's favor—shows that, at most, Meade told Oliveto that G.H. wanted to "change her story." Based on this comment, Oliveto wouldn't know anything about G.H.'s contemplated change, including whether it was material or a true recantation. And G.H. reasserted her allegations when Oliveto interviewed her.

Johnson also argues that Oliveto misled prosecutors by excluding critical information from the DII Investigative Summary. [Dkt. 73 at 5–6.] This is also unpersuasive. Oliveto's summary was just that—a summary. It didn't provide every detail, whether exculpatory or inculpatory, and the entire ISP Investigative File was attached to the summary for prosecutors to review. [Dkt. 56.] Nor did the summary make factual misstatements.[18] Consequently, Johnson has not shown that a jury could reasonably find that Oliveto misled prosecutors when he consulted them about charging Johnson. He is entitled to qualified immunity.

### ii. Claims Against Meade

Johnson fails to defeat Meade's qualified immunity defense for similar reasons. She claims that Meade clearly violated her constitutional rights by withholding exculpatory information, causing her arrest, detention, and prosecution, but didn't identify analogous caselaw or demonstrate egregious conduct.[19] [Dkt. 74 at 20.] Her argument for analogous caselaw is word-for-word identical to that against Oliveto and suffers the same defects: an overly generalized articulation of the constitutional right at issue and a failure to show that any case cited is factually similar to this case. [Dkt. 74 at 19–21.] It's also undisputed that Meade wasn't a law enforcement official,

---

[18]    Johnson argues that the statement in the summary that the injury was "alleged to have occurred on December 12, 2020" is false and misleading. However, it's undisputed that Meade told ISP that the injury allegedly occurred on December 12. [Dkts. 45, ¶ 26; 70 at 4, ¶ 26.] It's unclear where the allegation came from, but not false as stated in the summary.

[19]    Johnson also claims there are questions of fact as to whether Meade "mischaracterized or fabricated evidence" or "took an ostrich-like approach" to ignore other probable leads in order to arrest Johnson in bad faith. [Dkt. 74 at 15.] However, Johnson improperly conflates her allegations against Meade and Oliveto. The only allegation of wrongdoing against Meade is that he failed to disclose exculpatory information. There are no factual allegations that he mischaracterized or fabricated evidence and it's undisputed that after ISP took over the case, Meade had no duty to follow leads or otherwise investigate.

although the cases Johnson cites as analogous only involve law enforcement. *See Youngblood*, 547 U.S.; *Madero*, 97 F.4th; *McBride*, 576 F.3d. Even if Johnson had described an adequately scoped constitutional right, she needed to show that it was clearly established in the context of an administrative officer working adjacent to law enforcement—particularly one who had no investigative role other than to relay information and provide administrative support. *Volkman*, 736 F.3d at 1090.

Nor is this one of those "rare cases" where a constitutional violation is obvious. *Cibulka*, 992 F.3d at 641. Even if the Court assumes that Meade told Oliveto precisely what G.H. said to Meade ("[Johnson] did not do what I said she did.") before Oliveto interviewed her, Oliveto would still have had arguable probable cause to arrest Johnson because a recantation alone doesn't negate probable cause, much less arguable probable cause. *Garcia,* 79 F.4th at 880; *see also Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 351 (7th Cir. 2019) ("Police officers are constantly faced with reluctant witnesses and recanted confessions. Yet they are not required to use the rules for summary judgment and draw inferences in favor of the suspects." (internal quotation marks omitted)). G.H. initially implicated Johnson, recanted, and then reiterated her accusations when Oliveto interviewed her. It was reasonable for someone in his position to think, even mistakenly, that he had probable cause to arrest Johnson based on G.H.'s statements and leave the ultimate question of her credibility to the court. *Garcia*, 79 F.4th at 880 ("[T]he assessment of credibility rests with courts, not officers."). Meade's failure to disclose G.H.'s call is not material to

34

arguable probable cause. Therefore, he didn't obviously violate Johnson's constitutional rights and is entitled to qualified immunity.

### C.  Fifth Amendment Claims

Johnson also raises due process claims against Meade and Oliveto for withholding exculpatory evidence and fabricating evidence (Counts IV and IX). Johnson clarified that these are intended as *Brady* claims, asserting that the key to a civil *Brady* claim is "not a conviction or acquittal, but a deprivation of liberty" and that Johnson was deprived of her liberty when she was arrested and held while being charged. [Dkts. 73 at 11; 74 at 17–19 (clarifying that Counts IV and IX are *Brady* claims).] These claims fail as a matter of law against both defendants.

Johnson alleges the same injury here as articulated in her Fourth Amendment claims: that she was arrested because defendants withheld exculpatory information and because Oliveto fabricated evidence. But following *Manuel II*, 903 F.3d 667 (7th Cir. 2018), it's clear that "all § 1983 claims for wrongful pretrial detention—whether based on fabricated evidence or some other defect—sound in the Fourth Amendment . . . not the Due Process Clause." *Lewis v. City of Chi.*, 914 F.3d 472, 479 (7th Cir. 2019). If fabricated evidence is later used at trial to obtain a conviction, then a plaintiff may have a due process claim. *Patrick v. City of Chi.*, 974 F.3d 824, 834–35 (7th Cir. 2020) ("*Patrick II*"). But Johnson's case was dropped before any trial. *Lewis* and *Patrick II* therefore clearly foreclose her due process claims. *See also Young v. City of Chi.*, 987 F.3d 641, 645–46 (7th Cir. 2021); *Cruz*, 2024 WL 4753672, at *6–7; *Blackmon v. City of Chi.*, 700 F. Supp. 3d 617, 637–38 (N.D. Ill. 2023).

Johnson also argues that pretrial withholding of exculpatory evidence is a viable *Brady* claim based on *Armstrong v. Daily*, which held that the pretrial destruction of exculpatory evidence could support a *Brady* due process claim under § 1983, even without a trial. 786 F.3d 529 (7th Cir. 2015). She asks the Court to extend *Armstrong* to recognize a *Brady* claim here. [Dkt. 74 at 17–18.] However, *Armstrong* explicitly recognized that its logic doesn't map onto withholding, as opposed to destroying, exculpatory evidence. The Court reasoned that the destruction of exculpatory evidence "raises immediate constitutional concern because the resulting prejudice to the defense is permanent" and will "infect all future proceedings." Although "[i]t may or may not eventually cause harm," "harm is a separate issue." *Id.* at 552; *see also In re Watts Coordinate Pretrial Proceedings*, 2022 WL 9468206, at *4 n.5 (N.D. Ill. Oct. 14, 2022) (*Armstrong* does not support the proposition that use at trial of fabricated evidence is not required to state a due process claim). By contrast, evidence that is merely suppressed can still be disclosed before trial: "We therefore have been hesitant to recognize a § 1983 cause of action for the withholding of exculpatory evidence before trial because the constitutional violation is not even ripe if the prosecution can still meet its *Brady* obligation by disclosing the evidence in time for the defendant to use it." *Armstrong*, 786 F.3d at 552. The Seventh Circuit continues to follow this reasoning, so this Court must, too. *See Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017).

Johnson's claims separately fail because she hasn't shown a deprivation of liberty. She was arrested and held for six hours while being charged and released on

bond before her case was dropped pretrial. [Dkts. 52, ¶ 40; 70 at 23, ¶ 40.] *Cairel v. Alderden*, 821 F.3d 823, 831–32 (7th Cir. 2016) (no due process claim for fabrication of evidence or withholding exculpatory information where plaintiff was released on bond following arrest and acquitted at trial).

For the reasons above, Meade and Oliveto are entitled to summary judgment on Counts IV and IX.

### D. Civil Conspiracy Claims

Last, Johnson claims that Meade and Oliveto conspired to frame her for S.K.'s injury and withheld exculpatory evidence in violation of her constitutional rights to further the conspiracy (Counts V and X). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

Johnson's conspiracy claim cannot survive because the Court grants summary judgment on her substantive constitutional claims. *Coleman*, 925 F.3d at 351 (conspiracy claims require evidence of an underlying violation).

Her claims also fail because she's presented no evidence from which a jury could reasonably infer the existence of an agreement to conspire. Conspiracies, which "are often carried out clandestinely" and lack direct evidence, can be established with circumstantial evidence, "but such evidence cannot be speculative." *Freesmeyer*, 776 F.3d at 511. Johnson admits there's no evidence of an explicit agreement between Defendants and attempts a circumstantial showing. [Dkt. 73 at 19.] She notes that

37

Meade and Oliveto disagree about whether Meade disclosed G.H.'s call to Oliveto and theorizes that, based on these contradictory positions, "[t]he jury could conclude that both defendants are lying and that they previously had an agreement to hide exculpatory evidence from prosecutors that ultimately broke down, resulting in their current finger pointing." [*Id.*] This is speculative at best. Meade and Oliveto only communicated a handful of times during the investigation, [Dkts. 52, ¶ 53; 70 at 24–25, ¶ 50].[20] It's a leap to assume, based only on the fact that they disagree, that they must have had an agreement. There's no evidence to connect these dots and no jury could conclude from this barebones evidence alone that they conspired. Defendants are entitled to summary judgment on Counts V and X.

## V.      Conclusion

For the reasons above, Meade and Oliveto's motions for summary judgment are each granted. Civil case terminated.


Enter: 22-cv-6931
Date:  February 20, 2025

_____

Lindsay C. Jenkins
United States District Judge

---

[20]      Johnson disputes how many discussions Meade and Oliveto had during the investigation but cites no supporting evidence to suggest that they communicated more than a handful of times. [Dkt. 70 at 24–25, ¶ 53.]